**Lisa VOLK and Color Concepts, Inc.,**
**Petitioners/Counterclaim–**
**Respondents,**

v.

**X–RITE, INC.,**
**Respondent/Counterclaim–Petitioner.**

No. 4:08–CV–00054–JEG.

United States District Court,
S.D. Iowa,
Central Division.

March 2, 2009.

Bradley M. Beaman, Todd A. Strother, Bradshaw Fowler Proctor & Fairgrave, Des Moines, IA, for Petitioners/Counterclaim–Respondents.

Gregory M. Kilby, Warner Norcross & Judd LLP, Grand Rapids, MI, Linda M. Doyle, McDermott Will & Emery, Chicago, IL, Steven J. Havercamp, Stanley, Lande & Hunter, Davenport, IA, for Respondent/Counterclaim–Petitioner.

## ORDER

JAMES E. GRITZNER, District Judge.

In this action, Petitioners/Counterclaim–Respondents Lisa Volk and Color Concepts, Inc. (collectively "Volk"), pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. §§ 9 and 11, filed a petition seeking to correct and confirm an arbitration award entered in Volk's favor and against Respondent/Counterclaim–Petitioner X–

Rite, Inc. (X–Rite). Counterclaim–Petitioner X–Rite, pursuant to the FAA, 9 U.S.C. § 10, seeks to vacate the arbitration award entered in favor of Counterclaim–Respondent Volk. The Court held a hearing on the motions on January 23, 2009. Todd Strother and Bradley Beaman represented Volk. Linda Doyle represented X–Rite. The matter is fully submitted and ready for disposition.

## I. INTRODUCTION

X–Rite manufactures and sells color-measurement products. X–Rite's North American sales force consists of both direct-employee sales representatives, whom X–Rite considers to be employees, and manufacturer sales representatives, whom X–Rite considers to be independent contractors. From 1998 through 2002, X–Rite employed Volk as a direct-employee sales representative. In 2003, X–Rite told Volk that it was eliminating her direct-employee sales representative position and her only option for staying with X–Rite was to become a manufacturer sales representative. Volk chose to stay with X–Rite, entered into a written sales representative agreement in February 2003, and entered into subsequent written agreements in 2004 and 2005. In January 2006, X–Rite representatives traveled to Iowa and informed Volk that she was being terminated for unspecified business reasons.

Pursuant to the arbitration clause contained in the May 25, 2005, manufacturer sales representative agreement (the Agreement), Volk initiated an arbitration proceeding against X–Rite on January 12, 2007, before the American Arbitration Association (AAA). An arbitrator was duly appointed under the rules of the AAA, and the parties then proceeded to engage in discovery over the course of nearly a year.

In compliance with the Agreement's arbitration clause that the arbitration hear-

ing take place "in a major metropolitan area located approximately halfway between the home office of [X–Rite] and [Volk]," a hearing was held in Minneapolis, Minnesota, on November 26–27, 2007. Agreement ¶ 17. Following the hearing, both parties submitted post-hearing briefs to the arbitrator.

On January 30, 2008, the arbitrator issued an award for $619,906.54 in favor of Volk. The arbitrator found X–Rite liable to Volk for gender discrimination, breaching its written contract, and intentionally failing to pay Volk commissions she had earned. The arbitrator also issued a memorandum to partially explain the basis for the award but did not provide an exhaustive explanation of all aspects of the decision. The arbitrator awarded the following types of damages to Volk: (1) $539,697.50 for gender discrimination under the Michigan Elliott–Larsen Civil Rights Act (MELCRA); (2) $33,802.26, plus interest, for breach of contract for failure to pay commissions under the Michigan Sales Representative Act (MSRA); and (3) $46,406.78 in attorney fees and costs.

The arbitrator concluded Volk performed essentially the same services to X–Rite in her manufacturer sales representative capacity as she did as an employee, even though the Agreement characterized her as an independent contractor. Although Volk set up a company, Color Concepts, Inc., through which she performed her services as an X–Rite sales representative, the arbitrator concluded Volk received virtually all of her income from, and devoted virtually all of her time to, X–Rite. Volk made only two sales for other companies while working for X–Rite as a manufacturer sales representative.

The arbitrator concluded Volk was one of the top-producing sales representatives for X–Rite, and Volk was X–Rite's only

female sales representative in the United States. After Volk's termination, X–Rite divided her territory among three male employees. The Illinois territory was given to a male employee with far less experience than Volk. Stephen Hosford, X–Rite's North American Sales Director, testified that he did not ask Volk if she was willing to relocate to Chicago to service the Illinois territory because she had a husband who was employed in Iowa and had children in school there. However, X–Rite asked Dan Uress and Dave Borden to relocate in order to assume portions of Volk's territory after Volk's termination.

The arbitrator concluded Volk's termination did not make X–Rite more profitable or save any money. Volk, who was compensated at a twelve-percent commission rate on the date of her discharge, had the sales territories of Iowa and Missouri. If X–Rite granted Volk's request to expand her sales territory to include Illinois, then X–Rite would have paid its sales representatives twelve-percent commissions in all three states. However, after Volk's termination, X–Rite gave those states to a male employee, Dan Uress, and compensated him at a fifteen-percent commission rate. The arbitrator concluded X–Rite's reorganization could not save X–Rite money and was merely pretext for gender discrimination.

The arbitration clause in the Agreement provides that "the award of the arbitrators shall be final and judgment upon the award rendered may be entered in any court having jurisdiction." Agreement ¶ 17. On February 8, 2008, Volk filed in this Court a petition to confirm and correct the arbitration award. X–Rite subsequently filed a separate action to vacate the award in Michigan state court. After successfully removing X–Rite's lawsuit to the U.S. District Court for the Western District of Michigan, Volk filed a motion to

transfer X–Rite's lawsuit to the U.S. District Court for the Southern District of Iowa. Volk's motion was granted on April 28, 2008, 2008 WL 1913926, and X–Rite's action to vacate was transferred to the Southern District of Iowa. On that same date, X–Rite filed a separate motion to vacate the award in the Southern District of Iowa.

## II. DISCUSSION

### A. Motion to Vacate the Arbitration Award

#### 1. Choice of Law

As an initial matter, the Court must determine whether federal or Michigan law applies to X–Rite's motion to vacate. The arbitrator's award was based on Michigan law, which the parties do not dispute. However, X–Rite argues that Michigan law should govern the Court's review of the arbitrator's award, while Volk argues federal law should govern.

■ The choice-of-law and arbitration clauses in the Agreement state as follows:

16. *Choice of Law.* To the extent not otherwise displaced by applicable law, this Agreement shall be governed by and interpreted and construed in accordance with the laws of the State of Michigan.

*Arbitration.* To the extent not displaced by applicable law, the Company and the Representative agree that any controversies or disputes arising under this Agreement shall be determined exclusively by arbitration conducted in accordance with the rules of the [AAA]. The arbitration shall take place in a major metropolitan area located approximately halfway between the home office of the Company and the Representative. The award of the arbitrators shall be final and judgment upon the award rendered may be entered in any court having jurisdiction.

Agreement ¶¶ 16–17. As more fully discussed below, this is a pivotal determination because under Michigan law, an arbitrator's decision is vacated when "an error in law … led [the arbitrator] to a [material] wrong conclusion," *see Detroit Auto. Inter–Ins. Exch. v. Gavin,* 416 Mich. 407, 331 N.W.2d 418, 434 (1982), whereas under the FAA, an arbitrator's award will only be vacated when the arbitrator "clearly identif[ied] the applicable, governing law and then proceed[ed] to ignore it," *Stark v. Sandberg, Phoenix & von Gontard, P.C.,* 381 F.3d 793, 799 (8th Cir.2004). The Supreme Court has expressly held that the FAA contains the exclusive grounds for vacating or modifying arbitration awards, and parties cannot contractually agree to expand the grounds for judicial review. *Hall St. Assocs., L.L.C. v. Mattel, Inc.,* —— U.S. ——, 128 S.Ct. 1396, 1406, 170 L.Ed.2d 254 (2008). However, the Court implied that parties could contractually adopt state law arbitration rules because the "FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law, for example, where judicial review of different scope is arguable." *Id.*

When faced with a choice-of-law problem as to whether federal or state arbitration rules apply to reviewing an arbitration award, the Eighth Circuit in *UHC Management Co. v. Computer Sciences, Corp.,* 148 F.3d 992, 996–97 (8th Cir.1998), held that federal courts cannot read general choice-of-law provisions to opt parties out of the FAA default regime and that federal courts cannot apply state arbitration laws unless the parties' intent is "abundantly clear." *See also Dominium Austin Partners, LLC v. Emerson,* 248 F.3d 720, 729 n. 9 (8th Cir.2001) ("The

construction of an agreement to arbitrate is governed by the FAA unless the agreement expressly provides that state law should govern."). Discussing case law before and after the Supreme Court's decision in *Mastrobuono v. Shearson Lehman Hutton,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), the Eighth Circuit concluded it "will not interpret an arbitration agreement as precluding the application of the FAA unless the parties' intent that the agreement be so construed is abundantly clear." *UHC Mgmt.,* 148 F.3d at 996–97; *see also P.R. Tel. Co. v. U.S. Phone Mfg. Corp.,* 427 F.3d 21, 29 (1st Cir.2005), *rev'd on other grounds by Hall St. Assocs.,* 128 S.Ct. at 1396 (holding that "every circuit that has considered the question ... [has] held that the mere inclusion of a choice-of-law clause within the arbitration agreement is insufficient to indicate the parties' intent to contract for the application of state law concerning judicial review of awards"); *Jacada, Ltd. v. Int'l Mktg. Strategies, Inc.,* 401 F.3d 701, 711–12 (6th Cir.2005), *rev'd on other grounds by Hall St. Assocs.,* 128 S.Ct. 1396 (holding that generic choice-of-law provision did "not unequivocally suggest an intent to displace the default federal standard"); *Roadway Package Sys. v. Kayser,* 257 F.3d 287, 288–89 (3d Cir.2001), *rev'd on other grounds by Hall St. Assocs.,* 128 S.Ct. at 1396 ("We hold that a generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intended to opt out of the FAA's default regime."); *Porter Hayden Co. v. Century Indemn. Co.,* 136 F.3d 380, 382 (4th Cir.1998) ("[A]bsent a clearer expression of the parties' intent to invoke state arbitration law, we will presume that the parties intended federal arbitration law to govern the construction of the Agreement's arbitration clause.").

At issue in *UHC Management* was a contract where the arbitration clause was silent as to whether state or federal arbitration law applied. The contract contained a choice-of-law clause, which stated, "[t]o the extent not preempted by ERISA or other federal law, this Agreement shall [be] governed by and construed under the laws of the State of Minnesota." *UHC Mgmt.,* 148 F.3d at 994. On appeal, the Eighth Circuit concluded that it could "divine no such intent from the language in the present agreement. The agreement makes no reference to the Minnesota Uniform Arbitration Act or to Minnesota case law interpreting the allocation of powers between arbitrators and courts. Moreover, the choice-of-law clause itself specifically provides that Minnesota law must yield whenever preempted by federal law, which cuts against the argument that the parties intended that the FAA not apply." *Id.* at 997.

■ This Court must conclude that the generic choice-of-law clause in the Agreement does not make "abundantly clear" that the parties intended Michigan law to apply to federal court review of the arbitration award. As in *UHC Management,* the parties' choice-of-law will only come into play if it is not "displaced by applicable law." Although *UHC Management*'s contract uses the terms "preempted" and "federal law" while the Agreement uses the terms "displaced" and "applicable law," these are distinctions without differences under the rule articulated in *UHC Management* that the FAA will govern federal courts' interpretation of arbitration clauses unless the parties make "abundantly clear" their preference for state arbitration law. The words "displaced" and "applicable law" do not make an abundantly clear preference for Michigan law any clearer than the words "preempted" and "federal law." A generic choice-of-law clause that is silent on whether state arbitration rules will govern the agreement, as a matter of

law, does not make the parties' intent to have federal courts apply state arbitration law "abundantly clear." *Emerson,* 248 F.3d at 729 n. 9; *UHC Mgmt.,* 148 F.3d at 997.[1]

Accordingly, the Court finds the Agreement's generic choice-of-law provisions applying Michigan law do not displace the FAA because the parties do not make their intent to use state arbitration law "abundantly clear."

### 2. Applying the Federal Standard

The Eighth Circuit has permitted courts to vacate arbitration awards that are "completely irrational" or "evidence a manifest disregard for the law." *Hoffman v. Cargill,* 236 F.3d 458, 461 (8th Cir.2001). X–Rite's argument why the Court should vacate the arbitrator's award rests upon its claim that the arbitrator "evidence[d] a manifest disregard for the law." The Eighth Circuit has explained that "[a]n arbitration decision only manifests disregard for the law where the *arbitrators clearly identify the applicable, governing law and then proceed to ignore it.*" *Stark,* 381 F.3d at 802 (8th Cir.2004) (quoting *Hoffman,* 236 F.3d at 461–62) (emphasis in original). The *Stark* court went on to say,

A party seeking vacatur [based on manifest disregard of the law] bears the burden of proving that the arbitrators were fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it. Because arbitrators are not required to elaborate their reasoning supporting an award, if they choose not to do so, it is all but impossible to determine whether they acted with manifest disregard for the law.

Manifest disregard of the law is more than a simple error in law or a failure by the arbitrators to understand or apply it; and, it is more than an erroneous interpretation of the law. Our disagreement with an arbitrator's interpretation of the law or determination of the facts is an insufficient basis for setting aside his award.

*Id.* (internal quotations and citations omitted). The Eighth Circuit has "been careful to distinguish[ ] an arbitrator's interpretation of the law, which is insulated from review, from an arbitrator's disregard of the law, which may open the door for judicial scrutiny." *Lincoln Nat'l Life Ins. Co. v. Payne,* 374 F.3d 672, 674 (8th Cir.2004). *Payne* further illustrates the limited power of federal courts to vacate arbitration awards: "Manifest disregard

---

1. *UHC Management* forecloses all of X–Rite's arguments. First, X–Rite argues *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. University,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), explicitly authorizes the use of state procedure in arbitration cases. While this Court agrees with that point of departure in the analysis, it is just that. *UHC Management,* discussing *Volt,* held that parties could substitute the default FAA provisions with state law only when the parties' arbitration agreement makes their intent to use state arbitration law "abundantly clear." *UHC Mgmt.,* 148 F.3d at 995–97. Second, X–Rite argues the FAA does not preempt state arbitration laws that encourage arbitration but only preempts state laws that make arbitration more difficult. *See*

*Hudson v. ConAgra Poultry, Co.,* 484 F.3d 496, 502–03 (8th Cir.2007). However, whether or not the ambiguous choice-of-law clause encourages arbitration is not the relevant inquiry. *UHC Mgmt.,* 148 F.3d at 995–97. The relevant interpretive rule is that federal courts must interpret choice-of-law provisions as favoring the FAA unless the parties make their preference for a more expansive state arbitration law "abundantly clear." *UHC Mgmt.,* 148 F.3d at 995–97. Finally, X–Rite argues the Agreement's reference to AAA rules require application of Michigan law. However, the contract in *UHC Management* applied AAA rules but held that the arbitration clause did not make the parties preference for state law "abundantly clear." *Id.* at 994, 997.

requires something more than a mere error of law. If an arbitrator, for example, stated the law, acknowledged that he was rendering a decision contrary to law, and said that he was doing so because he thought the law unfair, that would be an instance of 'manifest disregard.' Nothing of the kind appears here. To require anything less would threaten to subvert the arbitral process." *Id.*

X–Rite argues that the arbitrator evidenced a manifest disregard for the law when the arbitrator, applying Michigan law, determined (1) Volk was an employee, and not an independent contractor, of X–Rite; (2) Volk demonstrated a prima facie case of employment discrimination under MELCRA; (3) Volk was entitled to damages for a time period where X–Rite argues Volk failed to mitigate damages; and (4) the effective date of the Agreement was May 25, 2005, instead of January 1, 2005.

### a. Employee not an Independent Contractor

X–Rite argues that only employees, and not independent contractors, can bring claims under MELCRA. *Badiee v. Brighton Area Schs.,* 265 Mich.App. 343, 695 N.W.2d 521, 535–36 (2005) (citing Mich. Comp. Laws § 37.2202(1)(a)). The Agreement states Volk "shall occupy the status of independent contractor with respect to [X–Rite] and this Agreement, and nothing contained herein shall be deemed to have created, by interpretation or implication, a relationship of employment, partnership, joint venture or agency." Agreement ¶ 10.

X–Rite argues that the express terms of the Agreement are conclusive, and the arbitrator's contrary conclusion constitutes manifest disregard for the law. This is contrary to Michigan law that holds "[a] contract between the parties which states that their relationship is that of an independent contractor is ... a factor to be considered, although it is not determina-

tive." *Buckley v. Prof'l Plaza Clinic Corp.,* 281 Mich.App. 224, 233–34 (Mich.Ct. App.2008) (quoting *Detroit v. Salaried Physicians Prof'l Assoc.,* 165 Mich.App. 142, 418 N.W.2d 679, 682 (1987)).

■ The arbitrator found that "Michigan applies the 'Economic Reality Test' to discern an employment relationship." Arb. Mem. at 1 (citing *Askew v. Macomber,* 398 Mich. 212, 247 N.W.2d 288, 290 (1976)). The arbitrator stated, "[t]he cases promulgated several factors to be considered in determining employment status. Those include the following: (1) control over worker's duties; (2) payment of wages; (3) the right to hire and fire and the right to discipline; and (4) the performance of duties as an integral part of an employer's business towards the accomplishment of a common goal." Arb. Mem. at 2 (citing *Askew,* 247 N.W.2d at 290). X–Rite concedes that the arbitrator identified the proper test to determine if Volk was an employee. However, X–Rite argues that the arbitrator relied on a single factor in making the following determination:

> Although there are certainly characteristics in the relationship between Ms. Volk and X–Rite which are consistent with the relationship of an independent contractor, the substance of the relationship was one of employee/employer because Ms. Volk was engaged in work that constituted a regular and integral part of the normal operation of X–Rite's business, and her rendition was not pursuant to the operation of separate distinct enterprise which was selling those services to the public as an independent contractor.

Arb. Mem. at 4. X–Rite asserts the arbitrator's conclusion, therefore, is contrary to *Askew*'s requirement that "[c]ontrol is a factor, as is payment of wages, hiring and firing, and the responsibility for the main-

tenance of discipline, but the test of economic reality views these elements as a whole, assigning primacy to no single one." *Askew,* 247 N.W.2d at 291. Quoting *Hyslop v. Klein,* 85 Mich.App. 149, 270 N.W.2d 540, 542 (1978), the arbitrator reasoned that the economic reality test "focus[es] [the court's] analysis on two basic queries: (1) Is the work performed a regular part of the normal operations of the business, and (2) Is the worker's method of operation sufficiently distinct from the employer's business as to constitute a separate enterprise?" Arb. Mem. at 1–2. As *Hyslop* held, all of the *Askew* factors concern one or both of these two inquiries. *Hyslop,* 270 N.W.2d at 542. "We are not suggesting any 'ultimate test' of economic reality such as was disapproved in *Askew* [ ]. We are attempting merely to establish a rational framework within which to consider and weigh the various factors in a manner consistent with the directive of *Powell v. Employment Security Comm.,* 345 Mich. 455, 75 N.W.2d 874 (1956)." *Id.* at 542 n. 3. The arbitrator properly applied *Hyslop,* which was faithful to Michigan's four-factor economic-reality test described in *Askew,* and determined that the economic-reality test supports a finding that Volk was an employee, and not an independent contractor, of X–Rite. X–Rite's contention is more precisely an attempt to readdress the merits of its argument under the economic-reality test, which is not a proper subject for this Court's review. *See Daniel Constr. Co. v. Int'l Union of Operating Eng'rs,* 738 F.2d 296, 299 (8th Cir.1984) (finding that an arbitrator's award cannot be set aside "even where the reviewing court would itself have reached a different result had the merits been submitted to it in the first instance.").

X–Rite also attacks the arbitrator's decision in that it only discusses one of the *Askew* factors under the economic-reality test—the control factor. The arbi-

trator clearly stated that "[t]his memorandum is intended to explain the basis for my award. It is not intended to provide an exhaustive explanation of all of the decisions that I made, but it is simply intended to give you a guide as to how I arrived at the Award." Arb. Mem. at 1. Failure to articulate every consideration upon which the arbitrator's decision is based is not grounds to vacate the award. As the Supreme Court has held,

> A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement. Moreover, we see no reason to assume that this arbitrator has abused the trust the parties confided in him and has not stayed within the areas marked out for his consideration. It is not apparent that he went beyond the submission.

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.,* 363 U.S. 593, 598, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). *See also Payne,* 374 F.3d at 674–75. The Eighth Circuit has similarly held, "Because arbitrators are not required to elaborate their reasoning supporting an award, if they choose not to do so, it is all but impossible to determine whether they acted with manifest disregard for the law." *Stark,* 381 F.3d at 802 (internal quotations omitted). While the arbitrator could have been clearer in weighing each individual factor, the arbitrator is not required to explain his reasons in the same way that

the court might explain its reasons. *Id.* at 803 ("Although this result may seem draconian, the rules of law limiting judicial review and the judicial process in the arbitration context are well established and the parties … can be presumed to have been well versed in the consequences of their decision to resolve their disputes in this manner.") (quoting *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 751 (8th Cir.1986)).[2] Accordingly, the arbitrator's conclusion that Volk was an X–Rite employee does not "evidence manifest disregard for the law."

### b. Prima Facie Case of Gender Discrimination under MELCRA

X–Rite argues Volk did not establish a prima facie case of gender discrimination under MELCRA. X–Rite argues that "[t]he modified *McDonnell Douglas*[3] prima facie approach requires an employee to show that the employee was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct." *Town v. Michigan Bell Tel. Co.*, 455 Mich. 688, 568 N.W.2d 64, 68 (1997) (footnote added). The arbitrator concluded that Volk was a member of a protected class, was subject to an adverse employment action, was qualified for her position, and "was terminated under circumstances that give rise to an inference of discrimination." Arb. Mem. at 4.

 X–Rite argues that based on the arbitrator's memorandum, Volk failed to prove that X–Rite treated other similarly-situated persons outside the protected class differently as required under MELCRA's *McDonnell Douglas* framework. X–Rite ignores an abundance of contrary precedent to X–Rite's position supporting the arbitrator's articulation of the *McDonnell Douglas* standard. The Michigan Supreme Court articulated the fourth MELCRA factor as "failure to obtain the position occurred under circumstances giving rise to an inference of unlawful discrimination." *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 666 N.W.2d 186, 193 (2003); *see also Mick v. Lake Orion Cmty. Schs.*, 474 Mich. 948, 706 N.W.2d 725, 726 (2005) (describing fourth prong as "the job was given to another person under circumstances giving rise to an inference of unlawful discrimination"); *Hazle v. Ford Motor Co.*, 464 Mich. 456, 628 N.W.2d 515, 521 (2001) (describing fourth prong as "the job was given to another person under circumstances giving rise to an inference of unlawful discrimination."); *Lytle v. Malady*, 458 Mich. 153, 579 N.W.2d 906, 914 n. 19 (1998) (describing fourth prong as the plaintiff "was discharged under circumstances that give rise to an inference of unlawful discrimination," but cautioned that this factor is not to be applied mechanically, but with due deference to the unique facts of the individual case).[4]

---

**2.** In search of simplicity, efficiency, and cost-containment through arbitration, something approaching perfection is a knowing sacrifice. *See, e.g., Hoffman v. Cargill*, 236 F.3d at 462.

**3.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**4.** In *Lytle v. Malady*, the Michigan Supreme Court held that the plaintiff "was nonetheless demoted and then discharged under circumstances giving rise to an inference of discrimination," and only in a footnote did the *Lytle* court articulate the original formulation of *McDonnell Douglas'* fourth prong. *Lytle* at 918 n. 30. Under MELCRA's application of the *McDonnell Douglas'* fourth prong, "discharged under circumstances giving rise to an inference of discrimination," the original *McDonnell Douglas* standard—other similarly

Federal courts interpreting Michigan law have reached the same conclusion. *See, e.g. King v. HealthRider, Inc.,* 16 F.Supp.2d 780, 782–83 (E.D.Mich.1998). In *Catanzaro v. Oakland County Cmty. Coll.,* 2007 WL 142158 at *4 (E.D.Mich. Jan. 16, 2007) (unpublished decision), the court expressly repudiates the argument that X–Rite now makes, that MELCRA requires the original *McDonnell Douglas* standard. *Catanzaro v. Oakland County Cmty. Coll.,* 2007 WL 142158 at *4 (E.D.Mich. Jan. 16, 2007) (unpublished decision). The *Catanzaro* court observed,

> Defendant's contention that Plaintiff cannot establish a prima facie case because he has not offered evidence that others not in the protected class and similarly situated were treated differently is without merit in light of *Hazle v. Ford Motor Co.,* 464 Mich. 456, 628 N.W.2d 515 (2001). It is true that "[c]ircumstances give rise to an inference of discrimination when the plaintiff was treated differently than persons of a different class for the same or similar conduct." *Wilcoxon v. Minn. Mining & Mfg. Co.,* 235 Mich.App. 347, 597 N.W.2d 250 (1999). But, following Hazle, there is no authority that a plaintiff alleging gender discrimination in a hiring decision must introduce that type of evidence in order to sustain a claim. Rather, evidence that others similarly situated were treated differently will give rise to an inference of discrimination, but it is not the only way to establish such an inference.

*Id.* In the context of interpreting gender discrimination under MELCRA, Michigan courts "are many times guided in [their] interpretation ... by federal court interpretations of its counterpart federal stat-ute." *Chambers v. Trettco, Inc.,* 463 Mich. 297, 614 N.W.2d 910, 917 (2000). The arbitrator's articulation of the fourth prong of the *McDonnell Douglas* standard as "[the employee] was terminated under circumstances that give rise to an inference of discrimination" (Arb. Mem. at 4), is consistent with Michigan precedent, and therefore the arbitrator did not "evidence manifest disregard for the law."

■ Finally, X–Rite argues the arbitrator failed to rebut X–Rite's non-discriminatory reason for Volk's termination. There is no evidence that the arbitrator intentionally ignored any case law regarding the showing of pretext. *See Payne,* 374 F.3d at 674–75 (holding that the party moving to vacate had the burden of persuasion to show "evidence, other than the result, that the arbitrator [was] aware of the law and intentionally disregarded it"). The arbitrator was not required to explain every part of his decision. *Enter. Wheel & Car Corp.,* 363 U.S. at 598, 80 S.Ct. 1358. Furthermore, any challenge to the sufficiency of the evidence to support the arbitrator's findings in concluding X–Rite's articulated reason for terminating Volk was pretextual is a question of fact for the arbitrator and is not subject to review on a motion to vacate. *See Stroh Container Co.,* 783 F.2d at 751 ("[The court] may not set aside an award simply because [it] might have interpreted the agreement differently or because the arbitrators erred in interpreting the law or in determining the facts.").

■ Though conclusory, the arbitrator's award evidences a finding that X–Rite's articulated reason for terminating Volk was pretextual when the arbitrator stated "[t]he reorganization clearly did not save

situated persons were treated differently—is only an example of how to prove MELCRA's fourth prong.

the company money ... [and] the company's failure to ask the question [whether Volk would consider moving to Chicago] simply because she was married and had children was discriminatory, and the company's articulated reason for the termination (i.e. to save money) was a pretext." Arb. Mem. at 5–6. Adopting the Supreme Court's interpretation of *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Michigan Supreme Court held,

[W]e expressly adopt the intermediate approach endorsed by the United States Supreme Court in *Hicks*. For a plaintiff to survive summary disposition, he must always present an issue of fact regarding whether the defendant impermissibly discriminated. In some contexts, this may be shown merely by disproving the employer's articulated reason, if, and only if, disproving the employer's reason also shows discrimination. In other contexts, merely disproving an employer's articulated reason will not prove discrimination.

*Lytle v. Malady*, 456 Mich. 1, 566 N.W.2d 582, 597–98 (1997) (internal citations omitted), *vacated on other grounds by* 458 Mich. 153, 579 N.W.2d 906 (1998).

Here, the arbitrator did not accept X–Rite's articulated reason for terminating Volk, concluding X–Rite's explanation that it would save money was contradicted by (1) X–Rite's decision to give Volk's territory to a less-experienced male employee who earned a higher commission and (2) X–Rite's decision not to offer Volk the Illinois territory on the basis of her gender. The arbitrator's explanation did not "evidence manifest disregard for the law."

### c. Mitigated Damages

■ X–Rite argues that the arbitrator awarded Volk damages for a period of time where Volk was not seeking employment. X–Rite's evidence consists of testimony "as to [Volk's] repeated attempts to find employment and her eventual decision to assist her husband in his attempt to start a new business after he also lost his employment on December 31, 2005." X–Rite's Reply Br. at 19. The arbitrator, in relevant part, concluded:

Ms. Volk seeks three years' net income at $175,879.00 per year for lost wages as a result of the gender discrimination. Average annual income over the three years prior to termination is an appropriate way to calculate lost wages under these circumstances where Ms. Volk's income varied from year to year. The amount of income is adequately established by the income tax returns in Exhibit 67.

I find that two and a half years is an appropriate length of time to award lost income. This is based on two considerations. First, her employment could be terminated on 90 days notice without cause after the one year term of her contract with the company expire [sic], and second, the difficulty of finding suitable replacement employment in light of her experience, skills, and compensation. The difficulty of finding replacement employment is evidenced by the fact that despite reasonable efforts, Ms. Volk has not found replacement employment.

Arb. Mem. at 6.

■ Volk testified at the hearing about the difficulties she encountered in her repeated attempts to find suitable replacement employment. As noted, Volk's efforts and difficulties were acknowledged in the arbitrator's damages award. In reviewing the arbitrator's award, courts cannot reassess the arbitrator's determination of facts. *See Stroh Container Co.*, 783 F.2d at 751 (under the FAA, courts should not set aside the arbitrator's award "simply because ... the arbitrator[ ] erred ... in determining the facts"); *see also El*

*Dorado Sch. Dist. No. 15 v. Cont'l Cas. Co.*, 247 F.3d 843, 847 (8th Cir.2001) ("Arbitrators are not required to elaborate their reasoning supporting an award.").

Furthermore, the arbitrator in this case did make a finding of fact that Volk was entitled to two-and-one-half years of lost income. While the factual basis for the arbitrator's decision is not thoroughly explained, the arbitrator was not required to elaborate his award. *See Stark*, 381 F.3d at 802. The arbitrator explained his reasoning in a way that did not "evidence manifest disregard for the law."

### d. Effective Date of the Agreement

X–Rite's last challenge is that the arbitrator incorrectly determined the effective date of the Agreement as May 25, 2005, instead of January 1, 2005. The Agreement states, "This Agreement is made and entered into as of the 1st day of January 2005 ..." Agreement at 1. Regarding modifications, the Agreement goes on to state, "This agreement may be altered or modified only by means of an agreed upon and written amendment signed by the authorized representatives of the parties to this Agreement." Agreement ¶ 12. The arbitrator acknowledged that "the Agreement stated that it 'is made and entered into as of January 1, 2005,' " but concluded that a start date of May 25, 2005, should govern the Agreement, concluding,

> I have concluded that the "term" of the Agreement is 12 months, and that it may only be terminated for cause within that 12–month period. After the initial "term," it may be terminated on 90 days' notice with or without cause. As to this provision, I believe the Agreement is unambiguous and, therefore, any statements Mr. Hosford may have made regarding termination only for cause constitute inadmissible parole evidence.
>
> The question remains as to when the "term" of the Agreement began. I have

concluded that the "term" began on the date it was fully executed, May 25, 2005. The Agreement says that it "is made and entered into as of January 1, 2005." This is clearly not the case. The parties had not agreed on the commission rate until sometime after January 1, 2005, and before the date of execution. X–Rite may argue that the parties intended the Agreement to be "effective" as of January 1, 2005, but that intention is contradicted by the way the parties treated the effective date under the first Sales Representative Agreement in 2003. Therefore, the Agreement could not have been terminated without cause prior to May 25, 2005.

Arb. Mem. at 7.

X–Rite argues that, under Michigan law, the Agreement was unambiguous and requires the party alleging modification of the contract to show by clear and convincing evidence that the other party intentionally and voluntarily relinquished this right. *See Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 666 N.W.2d 251, 261 (2003). X–Rite argues Volk did not meet her burden of proof that the parties intended the effective date of the Agreement to be May 25, 2005, instead of January 1, 2005.

█ Whether the twelve-month term in the contract began on the date the contract was actually signed on May 25, 2005, or the earlier date referenced in the opening paragraph of the contract, January 1, 2005, is an interpretation of the contract's terms, which is always a question for the arbitrator and not ordinarily subject to review on a motion to vacate. *See Stroh Container Co.*, 783 F.2d at 751 ("We may not set an award aside simply because we might have interpreted the agreement differently or because the Arbitrators erred in interpreting the law or in determining the facts."); *Schoch v. InfoU-SA, Inc.*, 341 F.3d 785, 788 (8th Cir.2003)

(holding that an arbitral award cannot be vacated "even if [the Court] is convinced that the Arbitrator committed serious error, so long as the Arbitrator is even arguably construing or applying the contract and acting within the scope of his authority.") (internal quotations omitted).[5] Although the opening paragraph of the Agreement indicates that it was made and entered into on January 1, 2005, it was not signed by X–Rite or Volk for more than four months, until May 25, 2005. The contract also contained a separate provision indicating that the duration of the contract would be "twelve months (12) from the date hereof." Because the parties "had not agreed on the commission rate until sometime after January 1, 2005, and before the date of execution," the arbitrator concluded the Agreement was ambiguous and that extrinsic evidence was required to discern the parties' intent at the time the Agreement was adopted. Arb. Mem. 7; see Bruno v. Detroit Inst. of Tech., 36 Mich.App. 61, 193 N.W.2d 322, 324 (1971) (holding that when the terms of an employment contract are in doubt, it is proper for a court to look, in its interpretation, at the conduct of the parties themselves with reference to the manner in which they have treated the contract, and an employment contract will be construed most strongly against the party preparing it). Accordingly, the arbitrator explained his reasoning in a way that did not "evidence manifest disregard for the law."[6]

**B. Motion to Confirm and Amend Award**

The FAA permits parties to enforce arbitration awards using three different methods: a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it. See 9 U.S.C. §§ 9–11. "An application for any of these orders will get streamlined treatment as a motion, obviating the separate contract action that would usually be necessary to enforce or tinker with an arbitral award in court." Hall St. Assocs., 128 S.Ct. at 1402 (citing 9 U.S.C. § 6). "Under the terms of § 9, a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11. Section 10 lists grounds for vacating an award, while § 11 names those for modifying or correcting one." Id. "On a motion for confirmation, [federal courts] have no power to selectively modify the award to delete such an order from the [arbitrator's] decision unless one of the circumstances detailed in section[s 10 or] 11 of the FAA applies." UHC Mgmt., 148 F.3d at 999.

The FAA permits courts to modify arbitration awards under three circumstances:

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

---

**5.** X–Rite argues that an arbitrator is not free to interpret contracts that are not silent. See United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc., 484 U.S. 29, 37–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). However, Michigan law, and not federal law, controlled how the arbitrator interpreted the Agreement.

**6.** The arbitrator concluded although Volk was entitled to damages awarded for this five-month period, she could not collect those damages because it would constitute a "double recovery."

9 U.S.C. § 11. Volk asks the Court to invoke its authority under § 11(a) to find that there "was an evident material miscalculation of figures" in calculating the amount of damages X–Rite owed Volk on her breach of contract for failure to pay commissions claim. Specifically, Volk argues that the arbitrator made an evident material miscalculation of figures in awarding Volk $11,267.42 in past commissions owed by X–Rite and failed to add the mandatory penalty under the MSRA, Mich. Comp. Laws. § 600.2961, to that incorrect figure.

■ When the arbitrator discussed its award of damages for breach of contract for failure to pay commissions, the arbitrator explained that he had reviewed each line item of the spreadsheet and concluded that Volk met her burden of proof for recovery of commissions totaling $11,267.42, "excluding the Curwood sale," for which "Volk should receive the balance of 10%, or $9,797.70" in commissions. Arb. Mem. at 9.

The arbitrator awarded $21,065.12 in past commissions but listed only $11,267.42 in commissions owed and failed to include the $9,797.70 Curwood sale commission discussed in the memorandum. The arbitrator then doubled the amount of past commissions owed (excluding the Curwood sale), the penalty required by the MSRA, which resulted in an award of $22,534.84. Volk argues that had the arbitrator correctly calculated the total commissions awarded in his memorandum by including the Curwood sale ($11,267.42 + $9,797.70 = $21,065.12), he would have applied the mandatory penalty to that number to come up with the correct penalty of $42,130.24. Volk argues under Section 11(a) of the FAA, this constitutes an "evident material miscalculation of figures" in the award that the Court must correct.

The Eighth Circuit has not clearly defined what constitutes an "evident material miscalculation." However, the Fifth Circuit, quoting the Sixth Circuit, has held an evident material miscalculation occurs "where the record that was before the arbitrator demonstrates an unambiguous and undisputed mistake of fact and the record demonstrates strong reliance on that mistake by the arbitrator in making his award." *Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210, 214 (5th Cir.1993) (quoting *Nat'l Post Office v. U.S. Postal Serv.*, 751 F.2d 834, 843 (6th Cir.1985)). The Fifth Circuit "interpret[s] the term 'undisputed' to mean [a court] should look to see whether there is any rational basis for disputing the truth of the fact." *Id.*

This type of "unambiguous and undisputed mistake of fact" occurred in this case. The arbitrator's intent to include the Curwood sale in his arbitration award is evidenced by the arbitrator unambiguously concluding that Volk was entitled to a commission of $9,797.70 for her involvement in the Curwood sale and in an apparent oversight failed to include that commission in the award.

It is unclear whether the arbitrator would apply the MSRA to the Curwood sale. The arbitrator's "summary of commissions owed" classified the Curwood sale as a "service contract," not a contract for goods. The MSRA defines "Sales Representative" as "a person who contracts with or is employed by a principal for the solicitation of orders or sale of goods and is paid, in whole or in part, by commission. Sales representative does not include a person who places an order or sale for a product on his or her own account for resale by that sales representative." Mich. Comp. Laws. § 600.2961(1)(e). "Principal" includes a person who "[m]anufactures, produces, imports, sells, or dis-

tributes a product in this state." *Id.* § 600.2961(1)(d)(i).

While Volk undoubtedly was entitled to protections under the MSRA for her sale of goods, it remains unclear whether the MSRA applies for services contracts that relate to goods sold in business as in the Curwood sale. *See Klapp v. United Ins. Group Agency, Inc.,* 259 Mich.App. 467, 674 N.W.2d 736, 738 (2003) (holding that an insurance salesman seeking double damages and attorneys' fees under the MSRA for an insurer's failure to pay him renewal commissions was not entitled to this relief because insurance contracts were not among the tangible goods contemplated by the MSRA); *Mahnick v. Bell Co.,* 256 Mich.App. 154, 662 N.W.2d 830, 834 (2003) (MSRA was inapplicable where the plaintiff-appraiser, was not a salesperson who sold "goods" and the defendant-contractor did not produce, sell, or distribute a "product" but rather the plaintiff provided a service). In order to apply double damages to the Curwood sale, the Court would have to apply Michigan substantive law to determine whether the MSRA permitted the arbitrator to grant double damages for the Curwood sale. This depends on how the arbitrator would have applied the facts surrounding the Curwood sale to the relevant Michigan statutory and case law, which the reviewing court is barred from doing under Section 11(a) of the FAA.

The Court holds that the arbitrator's award included an "evident material miscalculation" when it omitted the commission owed for the Curwood sale. Accordingly, the Court will modify the arbitrator's award to include the award of $9,797.70 as determined in the arbitrator's memorandum supporting his award, but the Court does not apply the MSRA penalty to that amount.

## C. Attorneys' Fees

The FAA does not contain any provisions for awards of attorneys' fees to successful or prevailing parties. *Electrolux Home Prods. v. UAW,* 343 F.Supp.2d 747, 761 (N.D.Iowa 2004). An unjustified refusal to abide by an arbitrator's award may constitute bad faith for the purpose of awarding attorneys' fees. *Id.* at 762. District courts have great discretion in determining whether attorneys' fees are appropriate under the "bad faith" standard of the FAA. *Id.* ("Electrolux had substantial grounds justifying its refusal to comply with the arbitrator's award. Accordingly, Electrolux's justified refusal to comply with the award does not constitute evidence of bad faith and the UAW is not entitled to recover attorneys' fees.").

The MELCRA states "a court ... may award all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, to the complainant in the action if the court determines that the award is appropriate." Mich. Comp. Laws § 37.2804. The MSRA states the court "shall award to the prevailing party reasonable attorney fees and court costs." Mich. Comp. Laws § 600.2961(6). The MELCRA is permissive, while the MSRA is mandatory.

Even if attorneys' fees are mandatory under state statutory law, that does not compel federal courts reviewing arbitration awards to award attorneys' fees in proceedings pursuant to the FAA. In a similar context, the Seventh Circuit concluded, "the district court was correct in refusing to bootstrap the Illinois Consumer Fraud Act's attorneys' fees provision into section 9 of the [FAA]." *Menke v. Monchecourt,* 17 F.3d 1007, 1009 (7th Cir. 1994). Volk cites no authority requiring federal courts to award attorneys' fees for arbitration awards based on an underlying state statutory grant of attorneys' fees.

Furthermore, unlike the Illinois statute in *Menke v. Monchecourt,* the Michigan statutes do not require attorneys' fees for defending against an appeal, but rather grant discretion to award appellate attorneys' fees. *See McLemore v. Detroit Receiving Hosp. & Univ. Med. Ctr.,* 196 Mich.App. 391, 493 N.W.2d 441, 446 (1992) (awarding appellate fees under MELCRA).[7]

■ The Court declines to award Volk appellate attorneys' fees. Both X–Rite's motion to vacate and Volk's petition to confirm were based on factors clearly enumerated in the FAA and did not constitute an appeal of a "decision on the merits." *Menke,* 17 F.3d at 1009. Volk did not fully prevail on the petition to correct the arbitration award because the Court cannot apply MSRA double damages to the Curwood sale. Furthermore, the arbitrator did not specifically award appellate attorneys' fees, which gives this Court discretion whether to award such fees. X–Rite had reasonable grounds justifying its refusal to comply with the arbitrator's award and thus did not act in bad faith when it challenged the arbitrator's award, even though the Court ultimately determines X–Rite cannot prevail on its motion. *See Electrolux Home Prods.,* 343 F.Supp.2d at 761. Finally, the arbitrator's award of $46,406.78 in attorneys' fees in conjunction with the underlying award of MELCRA and MSRA damages adequately compensates Volk and supports adhering to the default American rule that each party should pay their own attorneys' fees. *See Travelers Cas. & Sur. Co. of Am. v. PG & E,* 549 U.S. 443, 448, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007).

## III. CONCLUSION

For the foregoing reasons,

X–Rite's Motion to Vacate (Clerk's Docket No. 12) must be **denied.**

Volk's Amended Petition to Correct and Confirm Arbitration Award (Clerk's Docket No. 13) must be **granted in part,** confirming the Arbitration Award as corrected, entering judgment in favor of Volk and against X–Rite on the relief awarded in the Arbitration Award, and correcting paragraph 2 of the arbitration award to read as follows:

2. Claimant Lisa Volk is awarded $21,065.12 on her breach of contract claim for failure to pay commissions when due, together with a penalty under the Michigan Sales Representative statute of $22,534.84, for a total of $43,599.96. Claimant Lisa Volk is entitled to pre-judgment interest on the commissions due of $21,065.12 from the date the Demand for Arbitration was filed at the statutory rate.

Volk's Petition is **denied in part,** as to Volk's request for attorneys' fees.

The Clerk is directed to enter judgment in favor of Lisa Volk and Color Concepts,

---

7. Volk relies on *Toll Brothers, Inc. v. Fekete,* 2008 WL 466596 (Mich.Ct.App. Feb. 21, 2008), to support her claim that attorneys' fees are mandatory. *Fekete* involved an arbitrator awarding attorneys' fees for $22,500. *Toll Bros., Inc. v. Fekete,* 2008 WL 466596 at *4. The reviewing trial court declined to award $3,925 in additional appellate attorneys' fees. *Id.* The *Fekete* court observed that "[t]he circuit court's decision not to award additional attorney fees in the amount of $3,925 was within the court's discretion. Under the circumstances, the circuit court's decision not to award additional attorney fees did not constitute an abuse of discretion." *Id.* However, the Michigan Court of Appeals did exercise its own discretion and awarded appellate attorney fees under Mich. Comp. Laws § 37.2802. *Id.*

Inc., in the amount of $629,704.24, plus interest at the applicable rate and costs.

**IT IS SO ORDERED.**